**Robert L. McCRAY, et al., Plaintiffs,**

v.

**Elbert DAWSON, et al., Defendants.**

**Civil Action No. 92–D–1180–E.**

United States District Court,
M.D. Alabama,
Eastern Division.

Oct. 24, 1996.

Michael W. Haley, Alabama Sheriffs Association, Montgomery, AL, pro se.

Lynnae F. Thandiwe, Southern Prisoners Defense Committee, Atlanta, GA, Robert E. Toone, Southern Center for Human Rights, Atlanta, GA, for Plaintiffs.

Kendrick E. Webb, Webb & Eley, P.C., Montgomery, AL, E. Wray Smith, Montgomery, AL, Jock M. Smith, Tuskegee, AL, Harry A. Lyles, Foshee & Associates, Montgomery, AL, Ellen Ruth Leonard, Andrew W. Redd, Alabama Department of Corrections, Legal Division, Montgomery, AL, for Defendants.

### ORDER

DE MENT, District Judge.

There being no objections filed to the Recommendation of the Magistrate Judge filed herein on October 1, 1996, said Recommendation is hereby adopted, and it is the

ORDER, JUDGMENT and DECREE of the court:

(1) that the Motion to Modify Consent Order filed by the defendants be DENIED;

(2) that the Motion for Contempt Sanctions filed by the plaintiff be GRANTED;

(3) that the construction of the Macon County Jail proceed on the following schedule

(A) The bid shall be awarded on or before December 15, 1996;

(B) Construction of the new Macon County Jail shall commence on or before January 15, 1997; and

(C) The jail shall be completed and occupied on or before June 30, 1997; and

(4) that for everyday that the defendants are past a deadline on the schedule, they are to pay $100.00 per inmate housed in the current jail until that deadline is met. This money will remain in a fund maintained by the court for the benefit of the inmates at the Macon County jail, to be disbursed at the discretion of the court-appointed monitor and the plaintiffs' counsel, upon approval of the court.

### RECOMMENDATION OF THE MAGISTRATE JUDGE

CARROLL, United States Magistrate Judge.

This cause is before the court on a Motion to Modify Consent Order filed by the defendants on July 2, 1996, and a Motion for Contempt Sanctions filed by the plaintiffs on July 25, 1996. This case began on September 21, 1992, when a number of inmates filed a *pro se* complaint challenging the conditions of their confinement at the Macon County Jail (the jail). They sued Elbert Dawson, the Macon County sheriff, and the Macon County Commission. The court appointed counsel, and the plaintiffs filed an amended complaint on May 20, 1993. On April 20, 1994, the parties filed a Joint Motion for Approval of Consent Order. The court approved and entered the Consent Order (order) on September 14, 1994. The order required the defendants to change numerous conditions at the current jail pending construction of a new jail by May 1, 1996. In addition, the order stated that if a new jail has not been built by May 1, 1996, then the defendants shall reduce the jail population from 40 to 30 persons. Further, the order states that the plaintiffs may seek further relief if the defendants do not comply.

After the defendants failed to respond to the plaintiffs' letters expressing concern about the defendants' alleged non-compliance, on February 13, 1996, the plaintiffs filed a Motion for an Order to Show Cause Why Defendants Shall Not be Held in Contempt (Show Cause Motion), alleging that the defendants were violating the Consent Order with respect to numerous issues, including the construction of a new jail. On February 15, 1996, the court ordered the defendants to

respond. The defendants responded on March 22, 1996, and supplemented their response on March 25, 1996.

On July 8, 1996, the plaintiffs and defendants filed a Joint Motion for Additional Relief and Measures to Ensure Compliance with Previous Orders Entered by the Court. This Motion lists the remedial measures that the defendants have taken since the filing of the plaintiffs' Show Cause Motion, and proposes additional remedial measures. The court will dispose of this Motion by separate recommendation, that recommendation will resolve all issues raised in the plaintiff's Show Cause Motion except the construction of a new jail, which is the subject of this recommendation.

On July 8, 1996, the court held a hearing at which the parties presented evidence on the plaintiffs' Motion to Show Cause and the defendants' Motion to Modify Consent Order. Pursuant to this court's Order, the defendants filed a Memorandum Brief in Support of Their Position on July 22, 1996, discussing modification of the Consent Order. The plaintiffs filed a Motion for Contempt Sanctions on July 25, 1996, regarding the construction of the new jail.

The court now turns to the specific issues before it: (1) whether the defendants have presented sufficient evidence for a Modification of the Consent Order, and (2) if not, whether they should be held in contempt and subject to sanctions.

### MODIFICATION OF THE CONSENT ORDER

The defendants ask this court to partially modify the consent order of September 14, 1994, by extending the time for completion of a new jail from May 1, 1996 to May 31, 1997,[1] and by allowing the defendants to maintain a population cap of 35, as opposed to 30, inmates. They claim that a "significant change in circumstances warrants revision of ... the Consent Order."

■ Rule 60(b) of the Federal Rules of Civil Procedure allows a court to relieve a party from its obligation under a final judgment, order, or proceeding if "(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment." A consent order is subject to modification according to the same rules applicable to other judgments and orders. *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

■ In *Rufo,* the Supreme Court set forth the standard for ruling on a Rule 60(b) motion in institutional reform litigation cases such as this one. First, the party seeking modification "bears the burden of establishing that a significant change in circumstances warrants revision of the [order]." *Id.* at 383, 112 S.Ct. at 760. The party may satisfy this initial burden "by showing either a significant change in factual conditions or in the law." *Id.* at 384, 112 S.Ct. at 760. The defendants in this case allege a significant change in factual conditions. According to *Rufo,* there are three situations in which a change in factual conditions could warrant modification: (1) when a change in conditions has made compliance with the order "substantially more onerous," (2) when an order "proves unworkable because of unforeseen obstacles," or (3) "when enforcement of the [order] without modification would be detrimental to the public interest." *Id.* It is important to note that although the change in circumstances need not have been unforeseeable, it must have been unforeseen. "Ordinarily, ... modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a[n] [order]." *Id.* at 385, 112 S.Ct. at 760.

■ If the moving party meets the initial burden of showing a significant change in factual conditions, the court then considers "whether the proposed modification is tai-

---

**1.** In a proposed schedule for completion of the new jail, filed on August 22, 1996, the defendants asked for an extension until June 30, 1997.

lored to resolve the problems created by the change in circumstances." *Id.* at 391, 112 S.Ct. at 763. Any modification to the order must be directly responsive to the problem created by the changed circumstances. Most importantly, the *Rufo* decision recognized by a court must determine and keep in mind the underlying purpose of the consent order. If the modification would in any manner frustrate or undermine the order's purpose, the court should proceed with extreme caution. *Id.* at 387–388, 112 S.Ct. at 761–762.

The purpose of the consent order in this case is to provide constitutional conditions of confinement for the inmates of the Macon County Jail by building a new jail. Improving the conditions at the old jail is only a temporary remedy until a new jail can be constructed. With this purpose in mind—the building of a new jail—the court turns to the first prong of the *Rufo* standard: whether the defendants have established that a significant change in factual conditions warrants revision of the order.

The defendants claim that four substantial, unforeseen changes, in fact, require this court to modify the consent order. First, they claim that at the time they agreed to enter into the order in March 1994, the Macon County Commission had relied on representations made by an investment banking company that Macon County could finance the construction of a new jail facility through a bond issue. However, in April 1995, another investment banking company, after more closely examining Macon County's financial position, advised the Commission that this would not be possible. This development required the Commission to appoint and utilize a conduit to finance the new jail facility under a lease back agreement. Second, substantial decreases in revenue due from Victoryland Racing Commission, in addition to the "City of Tuskegee reneging on an earlier commitment to assist the building of the new jail facility necessitated the Macon County Commission to change the direction of their building program from a conventional jail to a modular based design." Third, there were many problems concerning SteelPlex, the company with whom the Commission contracted to build the modular type jail, includ-ing that SteelPlex was unlicensed in Alabama and that SteelPlex may not have had the authority to work in Alabama. Finally, the old jail now houses all medium or high security inmates. The court addresses each alleged change in factual conditions in turn.

### Bond Issue

 The defendants' argument is as follows:

At the hearing, Alvena Williams, who is the finance director and clerk of the Macon County Commission, detailed the attempts of the Commission to obtain financing for the new jail facility. She stated that at the time the defendants executed the Consent Order in March 1994, the Macon County Commission had been receiving advice from the investment banking company of Frazer Lanier Company of Montgomery, Alabama. At that time, Frazer Lanier had represented to the Commission that there would be no problem in Macon County being able to finance the construction of a new jail facility through a bond issue. The plan as of March 1994 was to build a conventional jail which would cost between $3.5 and $4 million. The conventional jail was originally designed by the architectural firm of Watson, Watson & Rutland of Montgomery, Alabama. Based on the cost estimates of a conventional jail, Frazer Lanier Company advised the County Commission that Macon County would be able to finance the construction of this conventional jail through a bond issue. In April 1995, another investment banking company, The Chapman Company out of Baltimore, Maryland, thoroughly examined Macon County's financial position. After this examination, The Chapman Company advised the Commission that it would not be possible for Macon County to float a bond issue for the construction of a new jail facility. Shortly after learning this, the Macon County Commission, on advice of counsel, established and appointed the Macon County Building Authority as a conduit to finance the construction of the new jail facility and lease the use of the facility back to the County under a lease back agreement.

The defendants' argument boils down to this: in April 1995, a new investment banking company told the Commission that Macon County could not float a bond issue, so the Commission had to create the Macon County Building Authority, and this caused a delay. There are several problems with this explanation. First, the defendants have not offered any type of proof to support these assertions, and do not explain why another investment banking company examined their finances. In addition, they do not explain why they first learned of their inability to finance the jail *thirteen* months after their March 1994, agreement. Without explanation of these factors, at the very least, this appears to be a case of pure avoidance. That is, the defendants are essentially saying that they did not "thoroughly" examine their finances until thirteen months *after* they entered into the order. This is not a change in fact. Rather, this is a thirteen month delay in the defendants' attempt to comply with the order.

There are other problems with the defendants' bond issue argument. At the hearing, Frank H. Lee, the then chairman of the Macon County Commission testified that at the time the defendants signed the order, "I couldn't ascertain the cost" of the new jail. (R. 27) This shows that the defendants have not been blind-sided by a change in factual conditions. Rather, it shows that the defendants recklessly entered into the order, without taking their obligations seriously, and are now trying to justify their inaction by simply asserting a change of fact. The court is not persuaded.

In addition, Mr. Lee testified that before the defendants entered into the order, they consulted several investment banking firms regarding the financing of a new jail. When asked, "[w]hat was their opinion as to the ability of Macon County to obtain financing through issuing a bond?", Mr. Lee answered, "Well, we never got to the point of discussing the possibility of financing, we—as I indicated—discussed financing with several financial consultants, but we never got to the point of discussions as relates to feasibility of financing." (R.35–36) Again, it appears that the defendants entered into the order without taking their responsibilities seriously,

and are now looking to be excused from the predicament they caused.

Finally, the defendants argue that since the Chapman Company advised the Commission that Macon County could not float the bond issue, the Commission "established and appointed the Macon County Building Authority as a conduit to finance the construction of the new jail facility and lease the use of the facility back to the County under a lease back agreement." They argue that this caused a delay. However, Mr. Lee stated that the Macon County Building Authority entered into a contract with SteelPlex in July 1995, to build a jail within nine months. (R. 42) Under this plan, a new jail would have been constructed by April 1996. Since the consent order required the defendants to build a new jail by May 1996, it is clear to the court that the delay caused by the bond issue/financing problem had no bearing on the defendants' violation of the order. In other words, the bond issue problem was not a change in fact that made compliance with the order "substantially more onerous" or "unworkable" since a new jail could have been building by May 1, 1996, even after the Macon County Building Authority came into existence.

**Decreased Revenue**

█ The defendants also argue that decreased revenue constituted a substantial change in fact that made their compliance with the consent order unworkable. They contend that

> Receipts from tax revenues generated by the Victoryland Racing Commission form a substantial portion of the general fund budget. These revenues over the past two years have unexpectedly decreased by approximately 20%. Not only has this resulted in rethinking the type of jail facility to be constructed, but it has forced along with the increase in the Sheriff's Department jail budget, to reduce the budgets and lay off employees in every other county department. Further, at the time this Consent Order was signed by the parties, the Macon County Commission had received assurances from the City of Tuskegee that it would assist in financing the

new jail facility. After the Consent order was entered, the City of Tuskegee backed out of its commitment to assist in the jail project. Both a substantial decrease in revenue and the City of Tuskegee's backing out of its earlier commitment to assist in the jail project have forced the Macon County Commission to rethink its earlier plans to construct a conventional jail. In July 1995, the Macon County Building Authority entered into a contract with Steel-Plex for the construction of a modular based jail facility. A modular based jail facility could substantially reduce the cost of the overall jail project while at the same time provide an overall construction period which is significantly less than that of a conventional jail.

Basically, the defendants assert that this decrease in revenue caused delays because they had to redesign the jail in order to construct it with less money than they had anticipated. The facts make clear, however, that a change of circumstances did not cause the defendants to violate the consent order. The defendants entered into a contract to have a modular jail built in July 1995. Thus, by July 1995, they had resolved the hardship which befell them due to a decrease in revenue. That contract called for the construction of a jail within nine months. Even given the decrease in revenue, a new jail could have been built by April 1996. Thus, a decrease in revenue did not render the defendants' obligations under the order "substantially more onerous" or "unworkable."

In addition, the decrease in revenue from Victoryland was not an "unexpected" or "unforeseen" change in fact. Indeed, Alvena Williams, the finance director and clerk of the Macon County Commission, testified that

[t]he Macon County Commission has relied heavily on racing proceeds from the Macon County Racing Commission, the Victoryland Track in Macon County.... Over the past five to six years, we have seen a steady decline in the Victoryland proceeds,

due to the fact that from the peak years when we were receiving 450 to 550 thousand dollars a year, we are now receiving 300 thousand dollars, and still declining. So, we've suffered a 33 percent loss in revenues over that particular period in time.

According to this testimony, a decrease in revenue from Victoryland was completely foreseeable.[2]

In addition, a lack of money from the City of Tuskegee is not a sufficient reason to modify the order. The City of Tuskegee is not part of the order. The defendants should have had more from Tuskegee than their word—their reneggable word—when they entered into the order. That Tuskegee no longer offered the money was due to the defendants' carelessness, as opposed to an unforeseen change in fact.

**SteelPlex**

■ The defendants next argue that after the Macon County Building Authority entered into a contract with SteelPlex in July 1995, "serious questions arose regarding the validity of the contract." First, the issue arose over whether SteelPlex was licensed in Alabama and whether it could perform architectural services relating to the design of the jail in Alabama. In December 1995, the State Licensing Board for General Contractors wrote a letter to the Commission stating that SteelPlex is unlicensed in Alabama and that "contracts with unlicensed contractors have been ruled to be void as a matter of public policy." Finally, in February 1996, the Commission was "advised" that only a city, not a county government, could establish a public building authority. As a result, the Commission formed a non-profit corporation to finance the jail. In May 1996, Steel-Plex withdrew from negotiations concerning construction of the jail, and the non-profit organization has now agreed to hire architect Charles Moss of Moss & Associates in Bir-

---

**2.** It is true that when asked "was this decline expected at that time," Alvena Williams stated, "no, it wasn't." Ms. Williams could have been referring to the initial decline six years ago. Even if she were referring to the time frame relevant to this case, however, as opposed to the initial decline six years ago, the court finds that her earlier testimony contradicts this statement. Her earlier testimony clearly indicates the foreseeability of a decrease in revenue from Victoryland proceeds.

mingham to design the specifications for the project to be competitively bid.

The testimony elicited at the hearing is much less straight forward than this argument. Indeed, it is very difficult to ascertain exactly what transpired concerning the SteelPlex contract. What the court can discern, however, is that the defendants decided to wait to learn whether SteelPlex could build in Alabama, as opposed to, for example, looking into finding another company to build the jail or proceeding with SteelPlex, who did agree to hire a contractor licensed in Alabama. The defendants' inaction caused substantial delays in the building of the new jail.

The defendants have now represented to the court that they are in a position to hire someone who can build the jail; in addition, Alvena Williams testified that Watson, Watson & Rutland have resubmitted proposals to the Commission to build a jail at a cost lower than the original $4.5 million. Based on their representations, the court finds that there were ways for the defendants to have prevented the SteelPlex-related delay—they could have worked with another company; and they could have done so long before the deadline for building the new jail had passed.

That SteelPlex may or may not be able to work in Alabama is not a valid change in fact that made the defendants' responsibilities more onerous or made the order unworkable. Indeed, the record indicates that the Commission could not agree upon which route to take, so none was taken. As Dr. Haley, the Director of Jail Services for the Alabama Sheriff's Association and the court-appointed monitor in this case, said, "the detail of events [related to SteelPlex] were a little bit frustrating to me ... in that, although the commission, by majority, was ready to proceed, and indicated a willingness to proceed in every area, there still was, seemingly, an inability of the Commission to proceed." (R. 129) That the defendants chose not to move to an alternative plan is what made the consent order unworkable. Indeed, Alvena Williams testified that since March 1996, the defendants "have not made any progress" toward the construction of a new jail. Based on the record before the court, it appears that there were paths which the defendants could have chosen to avoid a delay concerning the SteelPlex issues, and that the delay was actually caused by problems within the Commission.

**High Security Inmates**

Finally, the defendants claim that Macon County has had extreme difficulty in getting persons charged with serious felonies tried. Macon County has requested special sittings from the circuit court to accommodate the backlog of persons charged with capital murder. At the time of the hearing, twelve of the thirty inmates incarcerated in the Macon County Jail were charged with murder. Ten of the twelve inmates are charged with capital murder. At least 60% of the inmates are now classified as high security inmates. Sheriff Warren made arrangements in the early part of 1996 to house minimum security inmates at the City of Notasulga jail. Even with this arrangement, it is unlikely that Macon County Jail will be able to sustain an inmate population at or below thirty. Sheriff Warren testified that in his opinion, he could maintain the jail with thirty-five inmates.

It is unclear to the court why a higher risk inmate population would be a reason to increase the population cap, and the defendants have offered no explanation.

Even if the defendants argued that there was an increase in inmate population, this court would not modify the consent decree. First, the defendants have admitted that alternatives to raising the population cap are available—namely, Sheriff Warren is able to arrange for alternative housing for inmates. More important, Dr. Haley testified that an increase in the prison population would be acceptable to him only if certain conditions were met. He said,

> I would agree, or be fairly comfortable, with an increase to 35, if—if all of the cells in the jail were operable, and if there was always adequate staff available, if adequate outdoor recreation continued to be provided on, you know, an absolute consistent basis, again, if everything was provided that should be provided. Again, that would mean all the locks fixed, all the cells

being operable, you know, the plumbing being operable. If all those conditions were in place, I believe the facility could handle 35.

And one more if—and that would be if the Circuit Court of Macon County could take some definitive action and help relieve the jail of some of those persons who were charged with very serious or violent crimes, to either release them, by failure to convict, or else convict them and have them transferred to the State Prison System, which would be more appropriate housing for them.

(R. 141–142) Based on the defendants' lack of proof that the Macon County Circuit Court has agreed to such measures, Dr. Haley's demands have not been met. The court cannot condone a population increase in an unconstitutional facility. For these reasons, the court finds that the defendants have not met their burden under *Rufo* of proving that an increase in high-risk inmates or an increase in prison population calls for the modification of the consent order.

**Noncompliance**

■ The court wishes to make several points concerning the defendants' behavior. First, the defendants' failure to notify the court before July 2, 1996, of its lack of progress in this case is *inexcusable.* Mr. Magruder testified that on May 24, 1996, he advised the Commission no longer to discuss the jail at public meetings because he did not want plaintiffs' counsel and the court to know about the County's lack of progress on the jail. (R. 24) This testimony makes clear that the defendants' Motion to Modify is simply a back-door attempt to prevent sanctions, and is part of a pattern of avoiding the court's order. Had the defendants raised valid concerns in their Motion to Modify, they would not have hidden their non-compliance from the court. They would have openly asked this court for assistance when they realized they were going to be in violation of the court's order. Instead, the defendants could not come to the court because they

themselves caused the non-compliance. Based on the evidence before it, the court concludes that the defendants have acted in bad faith.

In addition, it is *inexcusable* that the defendants filed their motion two months *after* the new jail was to be built. Although it should go without saying, the defendants are required to follow the court's order. There is no justification for the defendants' apparent strategy in this case, which seems to be that when a problem occurs, they let it sit without looking for alternatives. That alternatives were present—as the defendants now acknowledge by telling the court through motions that they can have a new jail built in less than one year—shows the court that the order was workable. It was simply the pace of the defendants' progress that made the order unworkable.

At the time of the hearing, the defendants admitted through the testimony of Ernest T. Magruder, a Macon County Commissioner, that: the County has not figured out what company is going to build the jail facility, no architectural design for the new jail has been completed,[3] there are no official specifications for the jail, the County does not own the land where the jail will be built,[4] there has not been any preparation on the plot of land where the jail will be built, the new bond issue has not been released, and there is no schedule for the release of the bond issue. Mr. Lee confirmed most of this information, and added that he was not even sure that the financing would take place through a bond issue. The defendants have offered no justification for their failure to implement these measures. It is clear to the court that the defendants have no excuse for failing to comply with the Consent Order on all of these levels. The defendants' noncompliance is alarming, and the court finds that the defendants' Motion to Modify is due to be denied.

**CONTEMPT SANCTIONS**

■ Courts may enforce compliance with their orders through civil contempt.

**3.** Mr. Lee, on the other hand, testified that there is an architectural design.

**4.** On August 22, 1996, the defendants submitted documentation showing that they acquired a deed on August 12, 1996.

*Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 1535–1536, 16 L.Ed.2d 622 (1966). Specifically, if a court concludes that a consent order should not be modified and that the defendants did not comply with the order, then the court may hold them in contempt and "impose sanctions designed to ensure compliance." *Mercer v. Mitchell,* 908 F.2d 763, 768 (11th Cir.1990). Parties subject to a court's order may demonstrate an inability to comply only by showing that they have made "in good faith all reasonable efforts to comply." *Citronelle–Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1301 (11th Cir.1991) (quoting *United States v. Ryan,* 402 U.S. 530, 534, 91 S.Ct. 1580, 1582–1583, 29 L.Ed.2d 85 (1971)). The court has already found that the order should not be modified and that the defendants did not comply with the order. Thus, the court has the power to impose coercive and compensatory sanctions. *In re Chase & Sanborn Corp.,* 872 F.2d 397, 400–401 (11th Cir.1989).

 When fashioning a sanction to secure compliance, a court considers "'the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'" *E.E.O.C. v. Guardian Pools, Inc.,* 828 F.2d 1507, 1515 (11th Cir.1987) (quoting *United States v. United Mine Workers of America,* 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947)). The court may impose sanctions necessary to force the contemnor to comply with its order, but may not impose sanctions which are so excessive as to be punitive. *Matter of Trinity Industries, Inc.,* 876 F.2d 1485, 1493 (11th Cir.1989). The court has numerous options to chose from, including a coercive daily fine, a compensatory fine, attorney's fees, expenses to the Monitor, and coercive incarceration. *Shillitani,* 384 U.S. at 371, 86 S.Ct. at 1536; *Alberti v. Klevenhagen,* 46 F.3d 1347 (5th Cir.1995); *Trinity Industries,* 876 F.2d at 1494; *E.E.O.C.,* 828 F.2d at 1516; *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.,* 793 F.2d 1529, 1535–1536 (11th Cir.1986).

The decision as to how the sanctions should be imposed is a difficult one. Obviously, the jail which should have been completed this year cannot be completed overnight. Equally as obviously, the Macon County Commission will not perform its responsibility under this consent decree unless the court, by sanction, forces it to do so. The Commission has provided a proposed schedule for completion of the jail by June 30, 1997. This schedule is acceptable but far from ideal. As noted previously, the court will not modify its original order to accommodate this new schedule. Were the court to take that action, the plaintiffs would again have to move for contempt to enforce the modified schedule. Instead, the court will use the schedule proposed by the Commission as a framework for imposing sanctions. The court specifically finds that there is a significant likelihood that, absent these prospective monetary sanctions, the defendants would continue to disregard the court order.

## CONCLUSION

For the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge

(1) that the Motion to Modify Consent Order filed by the defendants be DENIED;

(2) that the Motion for Contempt Sanctions filed by the plaintiff be GRANTED;

(3) that the construction of the Macon County Jail proceed on the following schedule

 (A) The bid shall be awarded on or before December 15, 1996;

 (B) Construction of the new Macon County Jail shall commence on or before January 15, 1997; and

 (C) The jail shall be completed and occupied on or before June 30, 1997; and

(4) that for everyday that the defendants are past a deadline on the schedule, they are to pay $100.00 per inmate housed in the current jail until that deadline is met.[5] This money will remain in a fund maintained by the court for the benefit of the inmates at the Macon County jail, to be disbursed at the discretion of the court-appointed monitor and

---

5. *See Sizzler Family Steak Houses v. Western Sizzlin Steak,* 793 F.2d 1529, 1536 (11th Cir.1986).

the plaintiff' counsel, upon approval of the court.[6]

DONE this 1st day of October, 1996.

---

**6.** *See Mobile County Jail Inmates v. Purvis,* 581 F.Supp. 222 (S.D.Ala.1984).